FINDINGS OF FACT AND CONCLUSIONS OF LAW
 

 HUBEL, United States Magistrate Judge.
 

 In this tort action by plaintiff V. Jo Anne Simpson against defendants Howard
 
 *1113
 
 and Jean Burrows, husband and wife,
 
 [1]
 
 plaintiff brings claims of intimidation, intentional infliction of emotional distress, invasion of privacy, and libel.
 
 [2]
 
 Plaintiffs claims are based on her allegations that defendants authored and distributed a series of letters addressed to various persons in Christmas Valley, Oregon. The letters, described more particularly below, were hostile to plaintiff, a lesbian, and expressed extreme animosity toward plaintiffs sexual orientation.
 

 Both parties consented to the conduct of trial and entry of judgment by a Magistrate Judge. 28 U.S.C. § 636(c)(1). Both parties waived a jury trial. I conducted a court trial on January 19 and 20, 2000. These are my findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).
 

 FINDINGS OF FACT
 

 I. Background of the Lodge and Plaintiffs Ownership
 

 The Christmas Valley Lodge and Restaurant (“the Lodge”) is located in Christmas Valley, Oregon, about one hundred miles southeast of Bend, Oregon. It is a primarily rural area with approximately 200-300 residents in the valley and approximately fifty residents in the town. The Lodge is located in town. It has a restaurant suitable for family dining and a bar.
 

 In 1996, plaintiff and her partner, June Swanson, purchased the Lodge from the Christmas Valley Park and Recreation District. Plaintiff and Swanson formed a limited partnership to purchase the Lodge with plaintiff the general partner and Swanson the limited partner. Before purchasing the Lodge, plaintiff had served in the Army for twenty years, had gone to cooking school, and had worked as a corrections officer for the State of Washington and for Clackamas County, Oregon. She had also successfully managed the American Legion Post 45 in LaPine, Oregon. The parties stipulated that plaintiff and Swanson took possession of the Lodge on April 15,1996.
 

 Plaintiff and Swanson renovated the Lodge in 1996 after taking possession, coordinating the renovations to keep business interruptions to a minimum. Renovations included painting, new carpet, and new blinds. Witness Wanda Lanier noted that the renovations covered many areas and improved the condition of the Lodge. One witness noted that the renovations affected the character of the dining room portion of the Lodge. According to Carl Shumway, with the addition of Keno in the dining room and with a greater emphasis placed on the bar portion of the business, the Lodge had more of a casino atmosphere after the renovations.
 

 Plaintiff testified that when she and Swanson first took possession of the Lodge, business was good. She held a grand opening party and also hosted wedding and anniversary parties. She described Sundays as the best day because many people would eat lunch at the Lodge after church. Athough she did not expect to realize a profit the first year, she did. In 1996, she and Swanson each received $1,000 per month in salary/draws and, after expenses and these monthly draws, they made $32,000 in profit at the end of the year.
 

 
 *1114
 
 II. The Letters
 

 At trial, twelve letters were received into evidence. They were circulated between May 1996, two weeks after plaintiff took possession of the Lodge, and June 1997. Because it is too cumbersome to repeat each letter verbatim in the body of this Opinion, they are attached here as Appendix A. In some cases, reference to only parts of such exhibits in an Opinion might suffice. In this case, however, the flavor and tenor of the contents of the letters is critical to understanding the evidence and the mental state of their creator. It is only by reading all of them in their entirety that the expressed antipathy and venom toward plaintiff and Swanson can be fully appreciated.
 

 Some selected passages illustrate the nature of the letters. One of the first letters refers to the “two Lesbians” as an “immoral abomination” and suggests that the sale of the Lodge to them will make Christmas Valley “a mecca for Queers, Lesbians, Perverts & other degenerates!!]” Ex. 1. It also states that “we should all be against” the women and that the “good fight should start now.”
 
 Id.
 
 It labels the women as “the enemy.”
 
 Id.
 

 Another letter states that the sale of the Lodge to “two Lesbians” “brings an immoral & unfavorable element into our community!!]” and indicates that the sale to “perverts” is the start of a “revolting development!!]” Ex. 2. A third letter, printed in heavy marking pen, states “NO FAGS IN C.V.” immediately above a swastika. Ex. 3. Another letter implores the residents of Christmas Valley to “[b]oycott the evil which invades your community!!]” Ex. 4. A letter received approximately June 1,1996, refers to plaintiff and Swanson as “outlaws” and “perverts.” Ex. 6.
 

 In June 1996, the letters turn more invective. For example, one letter entitled “THE LESBIAN SPIRIT IS ON THE PROWL IN CHRISTMAS VALLEY” starts with the following passage:
 

 Be forwarned [sic], my people, the Lesbian spirit is a malignant, putrefied, demonic force that will infect you and yours together with all your community if left to stand amoung [sic] you. It will prowl amoung [sic] you to see who it can infect, devour, pervert or kill.
 

 Ex. 8. According to the author, a lesbian is a “whore sitting on a scarlet colored beast full of blasphemy.”
 
 Id.
 
 The letter further states that “[t]he time has come to stand up for righteousness and morality[]” and implies that the lesbian spirit will devour the life of the community if the people “do nothing.”
 
 Id.
 

 The next week, the letters begin to suggest violence. For example, in a letter received July 5, 1996, the following text appears:
 

 Is the death penalty at work in this country today? You better believe it is and it will be enacted by the people of this country who are sovereign on those who corrupt this country and who are the enemies of this country.
 

 The Bible Says, “I will kill your chril-dren [sic] with death (Rev.2:23)[.] He shall rule you with a rod of iron.” (Note the modern day equivilant [sic] of a rod of iron in today[’]s world is a high powered rifle.)[.]
 

 The wicked shall flee from the iron weapon and the Bow of Steel (rifle) shall strike him thru [sic]. Job 20:24[.]
 

 Ex. 10.
 

 In November 1996, after Swanson had left Christmas Valley, a letter of just thirteen words was sent to the Lodge. It states:
 

 JUNE LEFT
 

 NOW IT[’]S YOUR TURN TO GO
 

 HEAD FIRST OR FEET FIRST Ex. 13.
 

 Finally, in a letter the next year, and addressed to Christmas Valley resident John Widenoja, the author states, refer
 
 *1115
 
 ring to plaintiff and “friends at the Christmas Valley Lodge,” that “[t]hey are going down, one way or another.” Ex. 12. The letter informs Widenoja that because he supported plaintiff, he has “made a target of [himjself and [he is] going down too.”
 
 Id.
 
 It further states that “[y]ou are on the list of people that are targeted.”
 
 Id.
 
 It warns Widenoja that he “will never know what hit [him].”
 
 Id.
 

 The letters were sent to various persons or entities in Christmas Valley, including the Christmas Valley Domestic Water District, Exs. 1, 6, 10; Skip Curtis and Linda Renk, members of the Christmas Valley Park and Recreation Board, Exs. 2, 9; Ruth’s Variety, Ex. 4; the Lodge, Exs. 5, 11, 13; Christmas Valley Water Supply, Ex. 8; and Widenoja, Ex. 12. According to witness Bill Remy, at least one letter was also sent to the Christmas Valley library. Additionally, State Police Officer Richard Watson, who conducted a criminal investigation into the letters, obtained copies of approximately twenty to thirty letters from community residents including some from Eric Lloyd, the pastor of the Christmas Valley Community Church.
 

 According to the testimony, people knew about the letters even without seeing them. For example, witness Wanda Lanier testified that the bar at the Lodge would get busy after a new letter was circulated because people would gather there to discuss it. She also noted that she had heard about the letters and, as a local business owner, had received one in the mail. She did not read it because it was not signed. Witness Robin More-house testified that she heard about the letters even though she never saw one. Witness Laurie Adams testified that she heard about the letters from her pastor. Trooper Watson stated that most people in Christmas Valley either had copies of the letters, had seen them, or had heard about them from others who had received them. Based on the evidence, I find that knowledge of the letters’ existence, and their contents, was widespread in the community, extending even to those who had not personally seen or read them.
 

 III. Defendants’ Role
 

 In early June 1997, Trooper Watson began an investigation into the letters. He spoke to plaintiff who explained that the letters had begun in May 1996 and had included what plaintiff perceived to be threats to her life. Trooper Watson interviewed other community residents and, as noted above, obtained copies of approximately twenty or thirty similar letters.
 

 During the investigation, Pastor Lloyd identified Mr. Burrows as one of two residents who might write letters with biblical references. When questioned further, Pastor Lloyd told Trooper Watson that Mr. Burrows was the person more capable of committing such an act. While Pastor Lloyd’s identification in and of itself proves little or nothing, it explains how Mr. Burrows became the focus of the investigation.
 

 Trooper Watson also learned from a local business owner that Mrs. Burrows and her daughter traveled to Bend or LaPine almost every Wednesday, leaving Christmas Valley early in the morning, spending the night with another daughter there, and returning to Christmas Valley on Thursday. According to Trooper Watson, several of the letters were mailed from Bend or LaPine on Wednesday afternoons.
 
 See, e.g.,
 
 Ex. 5 (postmarked Bend, Oregon on Wednesday, May 29, 1996 “PM”); Ex. 10 (postmarked LaPine, Oregon on Wednesday, July 3, 1996 “PM”); Ex. 11 (postmarked LaPine, Oregon on Wednesday, July 24, 1996); Ex. 12 (postmarked La-Pine, Oregon on Wednesday, June 4,1997).
 

 Trooper Watson sent four unopened envelopes containing letters he received from Pastor Lloyd, to the police laboratory to be tested for fingerprints. Mr. Burrows’s fingerprints were found on one of the letters. Ex. 15. Mr. Burrows’s fingerprints were on file because of his 1991 application for a gun permit with the Klamath County Sheriffs Office.
 

 
 *1116
 
 Based on the fingerprint, Lloyd’s indication that Mr. Burrows was capable of sending the letters, and the information about Mrs. Burrows’s trips to LaPine and Bend and the correlation of her schedule with some of the postmarks, Trooper Watson obtained a search warrant for the Bur-rowses’ residence.
 

 In an outbuilding on the property described by Trooper Watson as Mr. Burrows’s “pilot’s lounge,” officers found, in a filing cabinet behind a flight simulator, what Trooper Watson described as originals of the copies of letters he had seen in the community. He described them as originals because they were unfolded whereas the copies he had seen in the community had been tri-folded for mailing. One of the letters found was the original of Exhibit 13. Upon later analysis by the Oregon State Police, it was determined that Mr. Burrows’s fingerprint was on this original letter.
 

 The officers also found several pages of handwritten notes, which again Trooper Watson described as originals and not copies. These notes, copies of which were admitted as Exhibit 19, include a two-page document entitled “ENGAGE THE ENEMY” which speaks of the awakening of police, soldiers, and patriots. Ex. 19 at pp. 3-4.
 

 Additionally, the notes include vitriolic remarks directed against homosexuals including “QUEERS! NO BAG LIMIT,” “NO ONE NEEDS A REASON! IT[’]S OPEN SEASON,” “GAYS! NO SPECIAL RIGHTS EXCEPT I HAVE YOU IN MY SIGHTS,” AND “HOMOS DIE OF AIDS, 45 ACP, 357 MAG WHAT IS YOUR CHOICE?”
 
 Id.
 
 at pp. 6, 10. Additionally, one of the pages was directed at Widenoja. It stated “WEDNOJIA!!! [sic] YOUR [sic] ON OUR HIT LIST.”
 
 Id.
 
 at p. 8. At the bottom of the page is a swastika.
 
 Id.
 

 Trooper Watson interviewed Mr. and Mrs. Burrows about the documents discovered during the search. Trooper Watson testified that Mr. Burrows admitted that he, his wife, his daughter, and his son-in-law, sat down at the table one night and wrote out the pages admitted as Exhibit 19. According to Trooper Watson, Mrs. Burrows told him that she remembered sitting at the table with her husband, daughter, and son-in-law “writing out their views,” but she did not think the documents were still around.
 

 Trooper Watson also talked to Mrs. Burrows at this time about her trips to Bend and LaPine. Trooper Watson testified that Mrs. Burrows told him that she spent a lot of time traveling to Bend and LaPine to shop for groceries and that she sometimes mailed bills for her husband from LaPine.
 

 Additionally, Trooper Watson spoke to Mr. Burrows about the presence of his fingerprint on the letter inside the unopened envelope given to Trooper Watson by Pastor Lloyd. Trooper Watson testified that Mr. Burrows said that a couple of “girls that come and go” handed him some letters to read and he then handed the letters back to them.
 

 Trooper Watson also sent three envelopes to the police laboratory for DNA testing. Two of the envelopes were addressed to Widenoja and one was addressed to the Lodge. A copy of the envelope addressed to the Lodge is found at page 2 of Exhibit 13. Trooper Watson obtained the envelope addressed to the Lodge from plaintiff, who received the letter found at page 1 of Exhibit 13 in that envelope.
 

 The laboratory took cuttings from the envelope flaps and on each one found DNA consistent with Mr. Burrows’s DNA. Ex. 17. The DNA type at issue occurs in 1 of 53,200 Caucasians, in 1 of 3,090,000 African-Americans, and in 1 of 134,000 Hispanics.
 
 Id.
 
 the DNA found on two of the three cuttings from the envelope mailed to the Lodge was a mixture of DNA sources. As explained at trial by Susan Hormann, a criminalist with the Oregon State Police who performed the DNA analysis, one of the three cuttings from this envelope con
 
 *1117
 
 tained a single DNA source which matched Mr. Burrows’s DNA. The other two cuttings contained a mixture with the major DNA source in the mixture consistent with Mr. Burrows’s DNA. Hormann testified that the presence of a minor DNA source could be explained by the handling of the envelope by a mail carrier or the recipient.
 

 Based on Trooper Watson’s investigation, Mr. Burrows was indicted for one count of intimidation in the first degree for Ms actions against plaintiff, one count of intimidation in the first degree for his actions against Swanson, and one count of harassment for his actions against Wideno-ja. Ex. 20. Mr. Burrows later entered an
 
 Alford
 
 plea
 
 [3]
 
 to a reduced misdemeanor charge of intimidation in the second degree for his acts toward Swanson. Ex. 21. The other charges were dismissed.
 
 Id.
 

 Defendants deny that they authored and mailed the letters at issue. For the reasons explained in the Conclusions of Law below, I do not give the
 
 Alford
 
 plea preclu-sive effect in this case. Thus, I consider the evidence regarding defendants’ role in the creation and circulation of these letters without reference to Mr. Burrows’s guilty plea.
 

 In his direct testimony, Mr. Burrows denied writing the letters. He offered three explanations for the presence of his fingerprint on the unopened letter given to Trooper Watson by Pastor Lloyd. First, he testified that on more than one occasion during the time when the letters were circulating, he was approached at either the Christmas Valley store, the post office, or the library, by various individuals who handed him a copy of one of the letters and sought his opinion. In one instance, he explained, a woman with two young children approached him at the Christmas Valley store after she had finished using file photocopy machine there. The woman handed Mr. Burrows the letters and asked if he had seen them. He handled them and then returned them to her. Similar events occurred when he was approached by “young people” who handed him letters and inquired about his opinion. He testified that he handled the letters on all of these occasions.
 

 Next, Mr. Burrows testified that he regularly helped Ray Reece, one of his neighbors and the chairperson of the Christmas Valley Park and Recreation Board at the time, stuff envelopes with fliers promoting Christmas Valley recreational opportunities. Mr. Burrows suggested that, unbeknownst to him, Reece may have been mailing the letters instead of the Park and Recreation material and thus, his fingerprints found their way onto the letters. Mr. Burrows also argued that his DNA was present on the envelopes perhaps because of his assistance to Reece.
 

 Finally, Mr. Burrows explained that in working for Christmas Valley resident Jan Overholser, he assisted her with letters and papers. Mr. Burrows described Over-holser as a Christian activist, capable of drafting the letters at issue. He posited that she authored and mailed the letters and that somehow, through Ms working in her home office, his fingerprints had gotten on some of the letters. He conceded, however, that he did no work for her after January 1995, some sixteen months before the first letters appeared.
 

 I reject Mr. Burrows’s explanations for the presence of his fingerprints and DNA and find that, based on all of the evidence, Mr. Burrows authored and mailed the letters at issue in this case, or caused them to be mailed.
 

 The physical evidence is strong. Mr. Burrows’s fingerprint was on one mailed,
 
 *1118
 
 unopened letter, his DNA was on the envelopes of three mailed letters, and his fingerprint was on the original of Exhibit 13. Mr. Burrows’s alternative theories for the presence of his fingerprints and DNA are not credible. According to Mr. Burrows, on three.separate occasions, at three separate places, individuals in this small rural town, unknown to him, approached him with copies of the letters, asking for his thoughts and opinions about them. He described these persons as “just generic type folks that come and go.” Tr. 238.
 

 In a town where, according to Trooper Watson there are approximately fifty residents and approximately 200-300 residents in the surrounding area, it is implausible that Mr. Burrows, who appears to have lived in Christmas Valley for several years, would be unable to identify any of the people who picked him out to examine the letters. It is even more unlikely that such an occurrence would happen more than once. There just are not that many “generic type folks” around Christmas Valley.
 

 The possibility that his fingerprints were found on the letters because he touched them while working for Overholser is even more remote. As noted above, he did not work for her after January 1995. Plaintiff and Swanson did not take possession of the Lodge until April 1996 and the first letters did not appear until May 1996. The testimony was clear that before plaintiff and Swanson moved to Christmas Valley, there were no known lesbians there. Thus, there was no one in Christmas Valley who could have been the subject of anti-lesbian sentiment until April 1996, some sixteen months after plaintiff stopped helping Overholser with her office work.
 

 As for Reece, I find Mr. Burrows’s testimony to be incredible. The testimony was self-serving and unsupported by any other evidence. Plainly, it was an attempt by Mr. Burrows to cast blame on an innocent neighbor. Mr. Burrows was asked when Reece had brought him these letters. Mr. Burrows could only state that Reece had brought them “over the years.” He did not identify the time as after plaintiff and Swanson had arrived in Christmas Valley. Obviously, with no one present to motivate the appearance of the letters until April 1996, any assistance provided by Mr. Burrows to Reece before that date would not have plausibly resulted in Mr. Burrows’s fingerprints being on the letters. Additionally, in the face of the other evidence, the fact that residents complained to Reece in his capacity as Chairperson of the Christmas Valley Park and Recreation Board, about plaintiffs and Swanson’s sexual orientation, is insufficient evidence to establish that Reece ever had a motive to write the letters.
 

 Third, Mr. Burrows offered no explanation for why the original of Exhibit 13 was found in his residence. The only rational explanation is that he wrote the letter, made and mailed copies, and then filed the original in his personal files. While the presence of his fingerprint on this document, found in his home, may have an innocent explanation, it does show that he handled the original of Exhibit 13 at some time.
 

 Next, similar “hate” materials were found in Mr. Burrows’s residence. As noted above, Trooper Watson found, in Mr. Burrows’s pilot’s lounge, several pages of handwritten notes containing, for lack of a better description, propaganda of hate. It is logical to conclude that the author of such material would be capable of composing letters such as those at issue in this case.
 

 Mr. Burrows’s explanation for the presence of those notes in his files is nothing short of preposterous. In fact, from having observed him throughout the trial and listened to all of his testimony, I find his credibility so damaged by his inconsistent and ever changing stories that all of his testimony is unreliable. Mr. Burrows testified that the first five pages of Exhibit 19 came from a log book that he kept on a construction site he managed for Overhol-
 
 *1119
 
 ser. "While not impossible, I conclude that there is no reason for a construction manager to make such notes before January 1995, when Mr. Burrows stopped working for Overholser. It is equally unlikely that workers on a construction site would author such documents in that time period, during their workday, and then place them in a work-related log book.
 

 The more blatant fabrication is Mr. Burrows’s attribution of the remaining pages of Exhibit 19 to a “family” gathering at the Lodge. Trooper Watson testified that Mr. Burrows admitted to him that Mr. Burrows and his family wrote these documents at their kitchen table. Mr. Burrows explained that when he told Trooper Watson that statement, he was referring to a table at the Lodge. Mr. Burrows stated that the
 

 family I referenced to Trooper Watson was a family of Christmas Valley, where many people get together at the lodge, pull tables together, and they share whatever is there. They pass things around, like fliers, and poems, and this and that. And several times I mopped up the table after everyone has left, and pick things up, clean up, take things home.
 

 Some of the things that were passed around at the table at one of these family gatherings was some scribblings, and I think they are the scribblings [Exhibit 19J that Mr. Watson referenced.
 

 Tr. 221. He was unable to identify who wrote the documents.
 

 I reject Mr. Burrows’s testimony for several reasons. First, it defies common sense to think that he would pick up papers from a gathering as he described, take them home, and file them in a filing cabinet rather than simply discard them.
 

 Second, Mr. Burrows testified that he could name no other lesbian or homosexual in Christmas Valley. Thus, there was no motive for any anti-homosexual sentiment until plaintiff and Swanson took over the Lodge. The uncontradicted testimony is that Mr. Burrows did not go to the Lodge after plaintiff and Swanson purchased it. His testimony that he was present at the Lodge for a “family gathering” at which he cleaned up anti-homosexual “scribblings” contradicts the evidence that he did not go to the Lodge after plaintiff and Swanson arrived there.
 

 Third, both Mr. and Mrs. Burrows told Trooper Watson that they generated the writings with members of their family at their table. Trooper Watson, who at the time of his investigation had been with the Oregon State Police for approximately seventeen years, referred to his written report to confirm the statements made to him by Mr. and Mrs. Burrows and was firm in his testimony that those were the statements made to him. Defendants introduced no evidence suggesting any ill will by Trooper Watson toward them or any motive to fabricate by Trooper Watson. Because of his experience and impartiality, I credit Trooper Watson’s testimony regarding the admissions made by Mr. and Mrs. Burrows as to the source of the documents in Exhibit 19. I reject Mr. Burrows’s contrary explanations.
 
 [4]
 

 Finally, the evidence shows that after plaintiff filed her Complaint in this case, Mr. Burrows requested financial assistance for the litigation from the Alliance Defense Fund, Inc. (ADF). Ex. 14. A section in the ADF application requires the applicant to describe the procedural history and current posture of the case.
 
 Id.
 
 at p. 5. In response to that question, Mr. Burrows stated “[m]y wife & I have quoted scripture to homosexuals and they filed $4,000,000 suit for harassment and intimeadition [sic].”
 
 Id.
 
 In response to a
 
 *1120
 
 question regarding the chances for success on the merits, Mr. Burrows stated that “we had no intention of physical injury and there was none.”
 
 Id.
 
 at p. 6.
 

 During the trial, Mr. Burrows indicated that the responses to the questions in the ADF application were formulated based on what the Complaint said and did not constitute an admission. When asked if he was referring to plaintiff when he made the statement that he and his wife had quoted scripture to homosexuals, he stated: “When I made that statement, it’s a statement paraphrased out of my mentality, that it’s just there when I start something out.” Tr. 285.
 

 Clearly, Mr. Burrows’s' explanation for the particular statement makes no sense. His suggestion that the statements in the ADF application were written to explain plaintiffs allegations against him is unconvincing. The questions in the grant application are specific and straightforward. I can only conclude that Mr. Burrows made the statements in the grant application because they were accurate statements of his actions and that his contrary explanations at trial are a fabrication.
 

 In summary, given the fingerprint on the mailed, unopened letter, the DNA on the mailed envelopes, the original of Exhibit 13 being found in his home with his fingerprint on it, the authoring of similar anti-homosexual hate materials, and his admissions in the ADF application, I find that Mr. Burrows authored and circulated the letters at issue.
 

 Like Mr. Burrows, Mrs. Burrows also denied writing any of the letters. While the evidence linking her to the creation and distribution of the letters is not as forceful as that against Mr. Burrows, I find that Mrs. Burrows did have a role in facilitating the writing and circulation of the letters.
 

 First, as noted above, Trooper Watson testified that Mrs. Burrows explained to him that the documents found in the “pilot’s lounge” and reproduced at Exhibit 19, were created by Mr. and Mrs. Burrows and their daughter and son-in-law “writing out their views” at the table in the Bur-rowses’ home. Mrs. Burrows testified that when she made this statement to Trooper Watson, she thought he was talking about some “scribblings” that had been made during a tic-tac-toe or other game. Trooper Watson testified in rebuttal that he had made the- contents of the documents known to Mrs. Burrows before she made the “writing out their views” statement. For the reasons explained above in regard to crediting Trooper Watson’s testimony over that of Mr. Burrows, I find Trooper Watson’s testimony more persuasive than Mrs. Burrows’s testimony.
 

 Additionally, during her own testimony Mrs. Burrows herself confirmed that she, her daughter, son-in-law, and Mr. Burrows gathered in the kitchen to write out their opinions regarding “the lesbians.” Tr. 219. When asked whether she did nor did hot sit down at the kitchen table to engage in such an act, she responded that she “didn’t sit down at the table. I was usually busy serving, or doing something like that.”
 
 Id.
 
 Her response suggests that while she may not have been the person to actually pen the words, the documents found in the file cabinet of the “pilot’s lounge” expressed her views and she was a participant in their creation.
 

 Furthermore, while Mrs. Burrows disputed that she had any kind of Wednesday schedule, or any regular schedule, for her trips to Bend and LaPine, she conceded that she did travel there on occasion and that she sometimes mailed items from the LaPine post office on these trips.
 

 Based on her participation in generating similar anti-homosexual documents and her admission that she occasionally mailed items from the LaPine post office, I find it more likely than not that Mrs. Burrows assisted in the creation and circulation of the letters at issue in this case, despite her denials at trial.
 

 
 *1121
 
 IV. Impact on Plaintiff
 

 Plaintiffs testimony regarding the emotional distress caused by the letters was uncontradicted. She testified that the letters were responsible for Swanson leaving the area in September 1996 because Swanson’s fear, generated by the letters, caused friction in her relationship with plaintiff. At that point, plaintiff became the sole owner of the Lodge.
 

 Plaintiff stated that in response to the letters she bought a gun because she was afraid all the time. She felt trapped at the Lodge and felt that her life was in jeopardy. She was afraid to go anyplace in the dark. She had trouble sleeping and is still afraid when she hears noises. Even though she presently lives in another city, she is still afraid. She keeps her drapes pulled. She described being afraid of her own shadow.
 

 Plaintiff testified that the letters caused her to lose her trust in people and that she left Christmas Valley because she was afraid to continue living there. She continues to have occasional nightmares, mostly of people chasing her.
 

 In addition to fearing for her safety, plaintiff testified that the letters embarrassed her. She described how the letters caused her to lose her dignity and her reputation. She also stated that she suffered various physical problems including upset stomach, headaches, and crying jags. Nothing in the record calls this into question.
 

 As to the effect on the business of the Lodge, plaintiff testified that as soon as the first letter was distributed, less than one month after plaintiff took possession of the Lodge, the dining room immediately lost its Sunday business because no one came in for lunch after church. She described that although an establishment such as the Lodge will “always have your lounge people,” the restaurant business dropped progressively after the letters began circulating.
 

 Although plaintiff realized a $32,000 profit the first year, the Lodge failed to generate a profit after December 1996. Plaintiff also took no salary/draws after that time. In her opinion, but for the letters, she would have expected her profit to increase by one-third in 1997 and by another one-third the following year. However, plaintiff offered no factual basis for this opinion.
 

 Plaintiff sold the Lodge in September 1998. Between the purchase price and the renovations, plaintiff indicated that she paid $262,000 into the Lodge. She listed the Lodge at a sale price of $300,000 and sold it after six or eight months on the market for $199,000. Plaintiff testified that the letters caused her to operate the business at a loss which in turn affected the overall value of the Lodge.
 

 Wanda Lanier was an employee of the Lodge both before, during, and after plaintiffs ownership. She confirmed that business went down during plaintiffs ownership. She indicated that the business in the bar would increase briefly when a new letter was circulated. Thus, it appears that the decrease in business occurred mostly in the restaurant.
 

 Lanier, and other witnesses, also indicated that plaintiff’s and Swanson’s sexual orientation in and of itself, independent of the letters, caused some residents to boycott the Lodge. Lanier testified that the “churchgoers” stopped coming, because of plaintiff’s and Swanson’s lifestyle, as soon as the sale papers were signed. Carl Shumway stated that controversy began almost instantly after plaintiff and Swanson bought the Lodge and that it was unrelated to the letters. Bill Remy testified that he learned of plaintiffs and Swanson’s sexual orientation when they were negotiating to purchase the Lodge, before the sale was final and before plaintiff and Swanson moved to Christmas Valley.
 

 Other witnesses suggested that plaintiffs personality, unrelated to her sexual orientation, was offensive and responsible
 
 *1122
 
 for the decrease in business. Esther Shamp found plaintiff to be overbearing and opinionated. Additionally, Lanier described, anecdotally, a couple of occasions in which plaintiff was rude to customers or potential customers. In Lanier’s opinion, the way plaintiff treated customers caused some loss of business.
 

 Lanier’s testimony suggested that plaintiffs rudeness became a factor only after the letters began circulating. Additionally, Shamp’s opinion of plaintiff could not have been developed before the appearance of the letters because they began circulating almost as soon as plaintiff and Swanson took over the Lodge. The most logical inference, and the one supported by a preponderance of the evidence, is that the letters and the emotional distress they caused, played a role in causing plaintiffs curt and sometimes overbearing personality traits witnessed by others at the Lodge. Additionally, the loss of business caused by the letters no doubt produced stress and tension in plaintiff, manifesting themselves in these personality traits. Thus, to the extent that plaintiffs personality caused some decrease in business, it is attributable to the letters and to- the loss of business occasioned by the letters.
 

 Based on the evidence, I find that there were two sources of business losses at the Lodge: (1) the letters; and (2) the boycotts related to plaintiffs and Swanson’s sexual orientation, unrelated to the letters.
 

 CONCLUSIONS OF LAW
 

 I. Burden and Standard of Proof
 

 In diversity actions,
 
 [5]
 
 state law governs the applicable burden and standard of proof.
 
 See, e.g., Robinson, Leatham & Nelson, Inc. v. Nelson,
 
 109 F.3d 1388, 1391 (9th Cir.1997) (in diversity action, state law governs questions as to which party bears the burden of proof);
 
 Forrestal v. Magendantz,
 
 848 F.2d 303, 307 (1st Cir.1988) (in diversity action, court bound to apply substantive law of the state including standard of proof).
 

 The law in Oregon is clear. “ ‘In
 
 ordinary civil cases
 
 the degree of proof required is a preponderance of the evidence,’ meaning ‘that the jury must believe that the facts asserted are more probably true than false.’ ”
 
 Zockert v. Fanning,
 
 310 Or. 514, 526, 800 P.2d 773, 780 (1990) (quoting
 
 Cook v. Michael,
 
 214 Or. 513, 527, 330 P.2d 1026, 1032 (1958)) (emphasis added in
 
 Zockert); see also
 
 Or.Rev.Stat. (ORS) 10.095(5) (prescribing preponderance of the evidence as standard of proof in civil cases); Or. Uniform Civil Jury Ins. No. 14.02 (defining preponderance of the evidence as meaning “the greater weight of evidence” and such evidence that, “when weighted with that opposed to it, has more convincing force is more probably true and accurate.”). Thus, Mr. Burrows’s comments in his closing argument regarding a “reasonable doubt” have no place in this case. No higher standard of proof is required.
 

 II. Liability
 

 A. Preclusive Effect of
 
 Alford
 
 Plea
 

 Under Oregon law, a guilty plea may be given preclusive effect in a subsequent civil proceeding.
 
 State Farm Fire and Casualty Co. v. Sallak,
 
 140 Or.App. 89, 914 P.2d 697 (1996);
 
 see also State Farm Fire and Cas. Co. v. Reuter,
 
 299 Or. 155, 163, 700 P.2d 236, 241 (1985) (criminal conviction can have preclusive effect in later civil proceeding). In
 
 Sallak,
 
 the Oregon Court of Appeals engaged in an issue preclusion analysis and concluded that all of the elements had been met by a guilty plea properly entered pursuant to Oregon law.
 
 Id.
 
 at 93-94, 914 P.2d at 700.
 

 Although the plea at issue in
 
 Sallak
 
 was not an
 
 Alford
 
 plea, the
 
 Sallak
 
 court cited a New York case which held that even an
 
 *1123
 

 Alford
 
 plea does not make a criminal conviction immune from the application of issue preclusion.
 
 Id.
 
 at 94, 914 P.2d 697, 914 P.2d at 700 (citing
 
 Merchants Mut Ins. Co. v. Arzillo,
 
 98 A.D.2d 495, 472 N.Y.S.2d 97 (N.Y.App.Div.1984)). Thus, there is precedent for concluding that Mr. Burrows’s
 
 Alford
 
 plea alone establishes that he authored and distributed the letters at issue.
 

 However, in both
 
 Sallak
 
 and
 
 Anillo,
 
 the court analyzed the entry of the guilty plea to ensure that in the underlying criminal proceeding, the criminal court had made a determination regarding the existence of a factual basis for the plea. In
 
 Sallak,
 
 the court stated that the “multiple safeguards surrounding the entry of a guilty plea were satisfied in this case.”
 
 Id.
 
 at 94, 914 P.2d at 700. The court noted that the criminal court had engaged in a colloquy with the then-criminal defendant to satisfy the court that the plea was voluntarily and intelligently made.
 
 Id.
 
 (citing ORS 135.390). Additionally, the court noted that the criminal court was required to make such inquiry as required to satisfy the criminal court that there was a factual basis for the plea.
 
 Id.
 
 (citing ORS 135.395).
 

 Similarly, in
 
 Anillo,
 
 the court stated that the plea must be knowingly and voluntarily made.
 
 Arzillo,
 
 98 A.D.2d at 506, 472 N.Y.S.2d at 104-05. Additionally, the court quoted the entire plea colloquy and noted that before the plea was accepted, the prosecutor outlined the case against the then-criminal defendant in an effort to satisfy the court that there was a factual basis for the plea.
 
 Id.
 
 at 500, 472 N.Y.S.2d at 101.
 

 The record in the instant case fails to demonstrate that the criminal court spoke with Mr. Burrows to determine that the plea was voluntarily and intelligently made or that there was a factual basis for the plea. While the law in Oregon does not require the personal appearance of a criminal defendant to plead guilty to misdemeanor charges,
 
 see
 
 ORS 135.360 (requiring the entry of a guilty or no contest plea in person in felony cases), the criminal trial court must still determine that the plea is voluntarily and intelligently made and that there is a factual basis for the plea. ORS 135.390, 135.395. Here, the plea petition is on a preprinted form in which boilerplate language states: “I plead GUILTY freely, voluntarily and knowingly on the factual basis of[:J [.]” Ex. 21 at p. 4. In the blank space following this boilerplate language are handwritten words which state “afford plea[7J”
 
 Id.
 
 Additionally, the word “GUILTY” at the top of the page and again in the middle at numbered paragraph five, has been crossed out.
 
 Id.
 
 The word “ALFORD” appears at the top of the page above the crossed out “GUILTY.”
 
 Id.
 

 The record contains no other evidence concerning the entry of the plea except Mr. Burrows’s testimony that he did not appear in court, he signed the papers at the direction of his attorney, and he did so not because he was guilty, but to simply end the matter because it was having an adverse effect on his wife’s health. Despite inquiry, plaintiff’s counsel could not locate and offer any transcript of a court appearance by Mr. Burrows for the entry of the plea. Thus, in contrast to
 
 Sallak
 
 and
 
 Anillo,
 
 there is no evidence in this record of the factual basis for the plea and there is questionable evidence that the plea was voluntarily or intelligently made. While in some cases an
 
 Alford
 
 plea may be entitled to preclusive effect, this is not one of them.
 

 B. Intentional Infliction of Emotional Distress
 

 “To state a claim for intentional infliction of severe emotional distress, a plaintiff must plead that (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant’s acts were the cause of the plaintiffs severe emotional distress, and (3) the defendant’s acts constituted an ex
 
 *1124
 
 traordinary transgression of the bounds of socially tolerable conduct.”
 

 McGanty v. Staudenraus,
 
 321 Or. 532, 543, 901 P.2d 841, 849 (1995) (quoting
 
 Sheets v. Knight,
 
 308 Or. 220, 236, 779 P.2d 1000, 1010 (1989)). The intent element is established where the actor desires to inflict severe emotional distress and also where the actor knows that such distress is certain, or substantially certain, to result from the conduct.
 
 Id.
 
 at 550-51, 901 P.2d 841, 901 P.2d at 853.
 

 Plaintiff must also show that defendants’ acts amounted to an extraordinary transgression of the bounds of socially tolerable conduct.
 
 McGanty,
 
 321 Or. at 543, 901 P.2d at 849. “Conduct that is merely ‘rude, boorish, tyrannical, churlish and mean’ does not satisfy that standard[.]”
 
 Watte v. Edgar Maeyens, Jr., M.D., P.C.,
 
 112 Or.App. 234, 239, 828 P.2d 479, 481 (1992) (quoting
 
 Patton v. J.C. Penney Co.,
 
 301 Or. 117, 124, 719 P.2d 854, 858 (1986)). The repeated nature of harassing behavior, while not controlling, bears on whether conduct is extreme or outrageous.
 
 Williams v. Tri-County Metro. Transp. Dist. of Or.,
 
 153 Or.App. 686, 694, 958 P.2d 202, 205,
 
 rev. denied,
 
 327 Or. 431, 966 P.2d 222 (1998).
 

 The evidence establishes that Mr. Burrows’s motive in writing and distributing the letters was to inflict severe emotional distress on plaintiff and Swanson. There is no doubt that he hoped that the letters would, at a minimum, force plaintiff to sell the Lodge and leave Christmas Valley. By using hostile, vitriolic, and inflammatory language, and expressing death threats, Mr. Burrows could have had only one intent: to cause plaintiffs and Swanson’s extreme emotional distress resulting in them leaving Christmas Valley.
 

 The acts clearly amount to an extraordinary transgression of the bounds of socially tolerable conduct. As discussed below in regard to the intimidation claim, the acts are tantamount to criminal conduct. There is no better expression of socially intolerable conduct than its codification as a criminal offense. Defendants have the right to believe that homosexuality or lesbianism is at odds with the teachings of the Bible. Certain expressions of that opinion are protected by the First Amendment and the Oregon Constitution. That does not mean, however, that defendants are immune from tort liability for their actions. The letters here rise beyond rude, boorish, or mean conduct. Additionally, the behavior here was repeated at least a dozen times over a period of more than one year, underscoring the outra-geousness of the acts.
 

 Finally, plaintiffs testimony that the letters caused her extreme emotional distress is undisputed and believable. Plaintiff has met her burden of proof on this claim.
 

 C. Intimidation
 

 ORS 30.190 provides for a civil action for compensatory and punitive damages to any person injured by a violation of ORS 166.155 or 166.165, regardless of any criminal prosecution or the result thereof. A prevailing plaintiff is also entitled to attorney’s fees under ORS 30.190(3).
 

 Under ORS 166.155, a person commits the crime of intimidation in the second degree if the person “[intentionally, because of the person’s perception of ... sexual orientation of another ..., subjects such other person to alarm by threatening ... [t]o inflict serious physical injury upon or to commit a felony affecting such other person, ... [.]” ORS 165.155(l)(c)(A).
 

 At least three of the letters meet this standard. First, Exhibit 3 which contains the words “NO FAGS IN C.V.” immediately preceding a swastika, is readily understood as subjecting another person to alarm by threatening that person. Second, the letter marked received on July 5, 1996, suggests that people will inflict their own death penalty on plaintiff and Swanson and that a high powered rifle will be used to kill them. Ex. 10. Third, the letter stating “JUNE LEFT[;] NOW
 
 *1125
 
 IT[’]S YOUR TURN TO GO[;] HEAD FIRST OR FEET FIRST” clearly implies that if plaintiff did not voluntarily leave, she would be killed or at least seriously hurt.
 

 While there may be more, these three letters are enough to establish that Mr. Burrows subjected plaintiff to alarm by threatening to inflict serious injury upon her because of her sexual orientation. With this, plaintiff establishes a violation of ORS 166.155 and thus, a violation of ORS 30.190.
 

 D. Invasion of Privacy
 

 Although not precisely identified by plaintiff in her Complaint, of the four privacy torts recognized in the Restatement (Second) of Torts § 652A, the facts here fit the “public disclosure of private facts” prong of the tort of invasion of privacy. Oregon recognizes this privacy tort.
 
 Tollefson v. Price,
 
 247 Or. 398, 430 P.2d 990 (1967). The elements are: (1) the facts disclosed are private facts; (2) defendants disclosed them to the public generally or to a large number of persons; and (3) the disclosure was in a “form of publicity of a highly objectionable kind.”
 
 Tollefson,
 
 247 Or. at 401-02, 430 P.2d at 991;
 
 see also Flowers v. Bank of Am.,
 
 67 Or.App. 791, 797, 679 P.2d 1385, 1389 (1984) (stating elements).
 

 Plaintiffs sexual orientation is a private fact. Mr. Burrows disclosed that fact to a large number of persons in Christmas Valley by mailing copies of these letters to various public institutions such as the library and the Christmas Valley Domestic Water District. Finally, as discussed above in connection with the intentional infliction of emotional distress claim, the disclosure here in the letters w’as extremely outrageous and thus, was publicity of a “highly objectionable kind.” Plaintiff has met her burden of establishing the elements of an invasion of privacy claim.
 

 E. Libel
 

 Plaintiff contends that several specific statements in the letters are libelous. First, however, I must address defendants’ argument that plaintiffs libel action is barred by the statute of limitations. Under Oregon law, there is a one-year statute of limitations for defamation actions. ORS 12.120. Here, the letters in evidence were generated sometime between May 1996 and June 1997. The Complaint was filed on November 28,1997. Thus, any action on defamatory statements made before November 28, 1996, is barred by the statute of limitations.
 

 Plaintiff argues that a continuing tort theory should apply to render all statements in all the letters actionable. I disagree.
 

 As recently noted by the Oregon Court of Appeals, “[a] continuing tort is based on 'the concept that recovery is for the cumulative effect of wrongful behavior, not for discrete elements of that conduct.’ ”
 
 Barrington v. Sandberg,
 
 164 Or.App. 292, 296, 991 P.2d 1071, 1073 (1999) (quoting
 
 Davis v. Bostick,
 
 282 Or. 667, 671, 580 P.2d 544 (1978)). Thus, where the evidence is that a plaintiff was harmed by each act in a series, the continuing tort theory does not apply.
 
 Id.
 
 at 297, 991 P.2d 1071, 991 P.2d at 1074 (citing
 
 Davis,
 
 282 Or. at 674-75, 580 P.2d 544).
 

 In contrast are cases such as
 
 Barring-ton
 
 where the plaintiff was not harmed by each incident in a series, but by the incidents as a whole.
 
 Id.
 
 at 297-98, 991 P.2d at 1074;
 
 see also Griffin v. Tri-County Metropolitan Transportation Distnct,
 
 112 Or.App. 575, 581-82, 831 P.2d 42, 46 (1992) (finding that each incident of a series did not by itself support a claim, but the incidents as a whole were a systematic pattern of conduct that led to a specific injury),
 
 rev’d in part on other grounds,
 
 318 Or. 500, 870 P.2d 808 (1994).
 

 Here, the evidence establishes that each letter caused harm to plaintiffs emotional well being, her business reputation, and
 
 *1126
 
 her personal reputation. The continuing tort theory does not apply and any statements made before November 28,1996 are barred by the statute of limitations. Accordingly, only statements made after that date are actionable.
 

 Statements challenged by plaintiff as libelous and made after November 28, 1886 include that plaintiff is a degenerate, a pervert, and leads a life of immoral conduct.
 
 See
 
 Ex. 12 (postmarked June 4, 1997).
 

 “The gravamen of the tort of defamation is the injury to the plaintiffs reputation caused by a statement communicated to someone other than to the plaintiff.”
 
 Kraemer v. Harding,
 
 159 Or.App. 90, 102, 976 P.2d 1160, 1169 (internal quotation omitted),
 
 rev. denied,
 
 329 Or. 357, 994 P.2d 124(1999). To establish a claim for defamation, plaintiff must first show that defendants made defamatory statements about her.
 
 Wallulis
 
 u
 
 Dymowski,
 
 323 Or. 337, 342-43, 918 P.2d 757, 758 (1996).
 

 Whether a statement is capable of having a defamatory meaning is a question of law for the court.
 
 Beecher v. Montgomery Ward & Co.,
 
 267 Or. 496, 500, 517 P.2d 667, 669 (1973). A statement is capable of a defamatory meaning if it would subject a person to hatred, contempt or ridicule, or tend to diminish the esteem, respect, goodwill, or confidence in which one is held, or to excite adverse, derogatory or unpleasant feelings or opinions against one.
 
 Farnsworth v. Hyde,
 
 266 Or. 236, 238, 512 P.2d 1003, 1004 (1973).
 

 All of the actionable statements are defamatory. Labeling plaintiff a pervert, a degenerate, or an immoral person subjects ed her to some amount of hatred, contempt, and ridicule, diminished any chance she had of earning the respect and goodwill of the community, and excited adverse, derogatory, and unpleasant feelings against her. Virtually all of defendants’ witnesses confirmed this with their testimony about their feelings about lesbians generally.
 

 Second, plaintiff must show that the statements were published by communication to a third party.
 
 Wallulis,
 
 323 Or. at 343, 918 P.2d at 758. I previoúsly found by a preponderance of the evidence that Mr. Burrows distributed the letters to third parties.
 

 ' Third, plaintiff must show that the statements were false.
 
 See Reesman v. Highfill,
 
 327 Or. 597, 603, 965 P.2d 1030, 1034 (1998) (plaintiff must show statements both false and defamatory). A statement cannot be deemed “false” unless the statement or its connotations are sufficiently factual to be susceptible of being proved true or false.
 
 See Milkovich v. Lorain Journal Co.,
 
 497 U.S. 1, 3, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Statements which are expressions of opinion are not actionable.
 
 Reesman,
 
 327 Or. at 605, 965 P.2d at 1035;
 
 but see Slover v. Oregon St. Bd. of Clinical Social Workers,
 
 144 Or.App. 565, 568, 927 P.2d 1098, 1100 (1996) (statement of opinion can be actionable, however, if the recipients could reasonably have concluded that the statement was based on undisclosed defamatory facts) (internal quotation omitted). Whether a statement is a statement of opinion or one of fact is a question of law.
 
 Id.
 

 I conclude that none of the surviving statements are actionable under a defamation theory of liability. The statements are either opinion or fail to contain sufficient facts to be susceptible of being proved true or false. While rude, boorish, churlish, and mean, they amount to only rhetoric and ranting and are not the kind of ascertainable factual statements required to sustain a defamation claim. Plaintiff fails to establish all the elements necessary to prevail on this claim.
 

 F. Joint Liability of Mrs. Burrows
 

 Oregon law recognizes three theories under which persons acting in concert may
 
 *1127
 
 be jointly liable for one another’s torts.
 
 Granewich v. Harding,
 
 329 Or. 47, 55, 985 P.2d 788, 793 (1999). Those theories are embodied in Restatement (Second) of Torts § 876,
 
 id.,
 
 and include conspiracy and “aid and assist.”
 
 Id.
 
 at 53-54, 985 P.2d at 792 (subsection (a) of section 876 describes committing a “tortious act in concert with the other” and subsection (b) describes knowingly giving “substantial assistance or encouragement” to the other).
 

 Here, plaintiff alleges that Mr. and Mrs. Burrows conspired to commit the tortious acts. Based on my finding above that Mrs. Burrows assisted in the creation and circulation of the letters at issue in this case, I conclude that she is jointly liable with Mr. Burrows as recognized in Restatement (Second) of Torts § 876 and in
 
 Granewich.
 
 As such, she is equally liable with Mr. Burrows for the commission of the torts discussed above.
 

 III. Damages
 

 A. Noneconomic
 

 As expressed by the Oregon Legislature, “ £[n]oneconomic damages’ means subjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment.” ORS 18.560(2)(b).
 
 [6]
 

 "[T]he general rule in Oregon in assessing damages has been that a plaintiff should recover only such sums as will compensate a plaintiff for the injury suffered as a result of a defendant’s wrong.”
 
 Yamaha Store of Bend, Or., Inc. v. Yamaha Motor Corp., U.S.A.,
 
 310 Or. 333, 344, 798 P.2d 656, 662 (1990),
 
 modified,
 
 311 Or. 88, 806 P.2d 123 (1991). In tort cases, “[ajs a general rule, the function of tort damages is to compensate the injured party for its loss.”
 
 Henderson v. Nielsen,
 
 127 Or.App. 109, 117, 871 P.2d 495, 500 (1994).
 

 Given plaintiffs undisputed testimony regarding the impact the letters have had, and still have, on her emotional health and her state of mind, including living in fear, nightmares, embarrassment, and physical symptoms such as headaches and crying, $200,000 in noneconomic damages is an appropriate amount to compensate her for the harm she has suffered as a result of defendants’ actions.
 

 B. Economic
 

 Plaintiff seeks recovery for three types of economic damages related to the Lodge. First, she seeks to recover the $1,000 per month salary/draw she received in 1996, for some period of time thereafter. Second, she seeks to recover the profits the Lodge would have generated after 1996. Third, she seeks to recover what she argues would have been a reasonable sale price for the Lodge, but for the decrease in business caused by the letters.
 

 While an intentional interference with economic relations or prospective advantage claim might have been the more appropriate tort for plaintiff to claim such damages, I find that economic damages related to the Lodge are appropriate in this case under at least two of the torts in which plaintiff has prevailed at trial. The case law is unclear whether economic damages to a business concern are available in an intentional infliction of emotional distress claim. However, the civil intimidation statute provides for both general and special damages with no suggestion of a limit on the types of special damages allowable. ORS 30.190. Additionally, the Restatement (Second) of Torts § 652H regarding invasion of privacy claims, states that recoverable damages include any spe
 
 *1128
 
 cial damages of which the invasion is a legal cause. Thus, business losses caused by defendants’ intimidation and invasion of privacy are proper special damages in this action.
 

 Plaintiffs testimony regarding her $1,000 per month salary/draw was undisputed and was a precise, specific figure not based on speculation. I conclude that plaintiff has met her burden of establishing that she would have continued to receive this amount on a monthly basis. The loss amounts to $21,000, representing twenty-one months (accounting for the time period of January 1997 through September 1998 when she sold the Lodge) at $1,000 per month.
 

 As for her lost profits and sale value of the Lodge, however, plaintiffs testimony was extremely weak and speculative. ■ She testified that the Lodge made $32,000 in approximately eight months in 1996, which, if annualized, would amount to $48,000 per year. She further testified that she guessed the Lodge would have made one-third more in 1997, or approximately $64,000, and then experienced an additional one-third profit increase in 1998, or just over $85,000 for that year.
 

 A plaintiff must prove lost profits damages with reasonable certainty.
 
 Willamette Quarries v. Wodtli,
 
 308 Or. 406, 412, 781 P.2d 1196, 1200 (1989);
 
 see also Parker v. Harris Pine Mills, Inc.,
 
 206 Or. 187, 197, 291 P.2d 709, 713 (1955) (amount of damages cannot be based on speculation or guesswork). “Lost profits or sales ... are not proved merely by testimony of unverifiable expectations of profits.”
 
 Wodtli,
 
 308 Or. at 412, 781 P.2d at 1200.
 

 Plaintiff, having been in business at the Lodge for only a short time before it experienced a downturn, and having no specific prior experience in this type of business, gave no foundation for her speculation of the Lodge’s future lost profits. The one-third increases were not proved with reasonable certainty. Thus, the only profit loss established by plaintiff is the $48,000 per year achieved in 1996. As a result, the lost profit damages are $48,000 for 1997 and $36,000 for the nine months of 1998 that she owned the Lodge.
 

 As to the sale price of the Lodge, plaintiff testified that the sale price was diminished by the loss of business caused by the letters. She explained that it is hard to get a good price for a business that is experiencing losses. It appears that any ongoing claim to the $1,000 per month salary/draw and $48,000 in lost annual profits, is subsumed into the damages awarded for the loss of value in the sale price.
 

 The proper measure of damages is the difference between the Lodge’s fair market value at the time it was sold and the price plaintiff obtained for it. Plaintiff appears to suggest that because she had $262,000 in the Lodge when she put it up for sale, the $300,000 asking price was reasonable. While it may be that plaintiff could have sold the Lodge for a higher price, plaintiff offered no foundation for her opinion that $300,000 was a fair market price absent any business problems caused by the letters. Again, plaintiff was speculative and offered the figure with no support except her own conjectural testimony. This is insufficient to establish a $101,000 claim for the alleged devalued sale price of the Lodge.
 

 Finally, as noted in the Findings of Fact, there are two causes of the business losses in this case — the letters and the anti-lesbian sentiment unrelated to the letters. I do not find that the sentiment, unrelated to the letters, would have produced all of the Lodge’s losses, or that the letters alone were the sole cause. Rather, based on the evidence that some people boycotted the Lodge after seeing or hearing about the letters and that others .began to boycott the Lodge immediately upon learning that plaintiff and Swanson were lesbians before any letters were circulated, I conclude that each factor independently
 
 *1129
 
 caused fifty percent of the losses. Thus, because the harm was produced by independent causes and is divisible, it is proper to take the total sum of economic losses and divide it by two to represent the amount attributable to the letters, the only source of damage for which plaintiff may recover from defendants.
 
 See, e.g.,
 
 W. Page Keeton et al,
 
 Prosser and Keeton on Torts,
 
 § 52, at 348-52 (5th ed.1984) (defendant not liable for entire harm when damages are capable of apportionment even when there is coincidence in time or similarity of design or conduct, as long as actors’ conduct is without concert); Or. St. Bar,
 
 Torts,
 
 § 15.13, at 15-10 (1992 rev., 1996 supp.) (‘“If two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused.’ ”) (quoting Restatement (Second) of Torts § 881 (1979));
 
 see also Id.
 
 at § 15.16, at 15-11 (unless harm is divisible, joint and several liability is imposed when both tortfeasors contribute to the harm).
 

 Under this formula, 1 award plaintiff fifty-percent of $105,000, or $52,500 in economic damages on her invasion of privacy and intimidation claims.
 

 C. Punitive
 

 Defendants maintain that the Oregon Constitution prohibits an award of punitive damages to plaintiff on any of her claims because all of defendants’ actions were solely expressive conduct. Generally, defendants are correct.
 
 See, e.g., Hall v. The May Dep’t Stores,
 
 292 Or. 131, 146—47, 637 P.2d 126, 135 (1981) (award of punitive damages for intentional infliction of emotional distress accomplished by speech runs afoul of speech protections of Article I, section 8 of Oregon Constitution);
 
 Wheeler v. Green,
 
 286 Or. 99, 119, 593 P.2d 777, 788 (1979) (punitive damages not recoverable when tort liability based on the content of speech).
 

 Plaintiff argues, however, that defendants’ statements are threats which are outside of the realm of protected speech, enabling her to recover punitive damages. Plaintiffs argument raises two issues: (1) does the Oregon Constitution exempt “true threats” from constitutional protection, and (2) are the statements “true threats” as that has been defined in the relevant caselaw.
 
 [7]
 
 I find no answer to the first question in the Oregon caselaw. I am not without guidance, however, because Judge Robert E. Jones of this court has previously held that if the trier of fact determines that a defendant communicated true threats to the plaintiff, then the defendant’s statements are not protected expression under the Oregon Constitution and the plaintiff is entitled to punitive damages.
 
 Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists,
 
 23 F.Supp.2d 1182, 1195 (D.Or.1998). 1 agree with Judge Jones’s conclusion.
 

 As to the second question, determining whether a threat is a “true threat” falling outside of constitutional protection is a question for the trier of fact.
 
 Melugin v. Hames,
 
 38 F.3d 1478, 1485 (9th Cir.1994). The proper inquiry is “ ‘whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression
 
 *1130
 
 of intent to harm or assault.’ ”
 
 Lovell v. Poway Unified Sch. Dist.,
 
 90 F.3d 367, 372 (9th Cir.1996) (quoting
 
 United States v. Orozco-Santillan,
 
 903 F.2d 1262 (9th Cir. 1990)). As explained in
 
 Lovell,
 
 the threats “should be considered in light of their entire factual context, including the surrounding events and the reaction of the listeners.”
 
 Id.
 
 (internal quotation omitted).
 

 The threats need not be express to be considered “true threats.”
 
 Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists,
 
 945 F.Supp. 1355, 1372 n. 14 (D.Or.1996)
 
 (Planned Parenthood I)
 
 (citing
 
 Lovell,
 
 90 F.3d at 372,
 
 United States v. Gilbert,
 
 884 F.2d 454, 455-57 (9th Cir. 1989)). Relevant factors include whether the statement is unequivocal, unconditional, immediate, or specific, and whether it conveys a gravity of purpose.
 
 United States v. Kelner,
 
 534 F.2d 1020, 1026-27 (2d Cir.1976) (cited with approval in
 
 Planned Parenthood I,
 
 945 F.Supp. at 1370). Finally, the plaintiff need not prove that the defendant had the ability or actually intended to physically harm the plaintiff.
 
 Melugin,
 
 38 F.3d at 1485.
 

 It is clear that some of the statements in the letters constitute “true threats.” Particularly, the following statements in Exhibit 10 meet the standard: (1) “Is the death penalty at work in this country today? You better believe it is and it will be enacted by the people of this country who are sovereign on those who corrupt this country and who are the enemies of this country[ ]”; (2) “He shall rule you with a rod of iron. (Note the modern day equivilant [sic] of a rod of iron in today[’]s world is a high powered rifle[ ])”; (3) “The Bow of Steel (rifle) shall strike him thru.” Ex. 10. Additionally, the November 1996 letter which states: “JUNE LEFT[,] NOW IT[’]S YOUR TURN TO GO[,] HEAD FIRST OR FEET FIRST” is also a true threat. Ex. 13. Finally, Exhibit 12, the June 1997 letter to Widenoja which (1) states, referring to plaintiff and her “friends,” that “[t]hey are going down, one way or another”; (2) suggests that there is a list of targeted people; and (3) implies that plaintiff is on that list, also contains true threats.
 

 These statements express unconditional threats of death. While avoiding express language, they are unequivocal and convey a sense of immediacy and imminent action. They demonstrate a gravity of purpose. A reasonable person would interpret these statements as a serious expression of intent to harm or assault. Thus, because they are true threats, the Oregon Constitution does not bar an award of punitive damages based on these statements.
 
 [8]
 

 Punitive damages must be proved by clear and convincing evidence. ORS 18.537(1). Evidence is clear and convincing when “the truth of the facts asserted is highly probable.”
 
 In re Conduct of Blaylock,
 
 328 Or. 409, 411, 978 P.2d 381, 381-82 (1999). The evidence must show that “the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others.” ORS 18.537(1).
 

 The evidence is clear and convincing:' defendants acted with malice, especially considering that the letters were numerous and multiple copies were distributed throughout the community; they showed a reckless and outrageous indifference to a highly unreasonable risk of harm to plaintiff; and, they acted with a conscious indifference to plaintiffs health, safety, and welfare. An award of punitive damages is appropriate.
 

 
 *1131
 
 There are several relevant factors I may consider in making a punitive damages award. These factors include (1) “pun-ishfing] willful, wanton or malicious wrongdoers[;J” (2) “deterr[ing] the wrongdoers and others similarly situated from further engaging in such conduct[;]”
 
 MacCrone v. Edwards Center, Inc.,
 
 160 Or.App. 91, 108, 980 P.2d 1156, 1166 (1999) (en banc) (citing
 
 Friendship Auto v. Bank of Willamette Valley,
 
 300 Or. 522, 532, 716 P.2d 715 (1986)); (3) the character of the defendant’s conduct; (4) the defendant’s motive; and (5) the income and assets of the defendant.
 
 See
 
 Or. Uniform Civil Jury Ins. No. 75.02A (listing several factors).
 

 While most of the factors point to a significant award, plaintiff offered no evidence regarding defendants’ income and assets. The only evidence in the record related in any way to this factor is the ADF application in which Mr. Burrows represents that defendants do not have the funds to hire an attorney. Analyzing the evidence in the record in light of the relevant factors, I award plaintiff $5,000 in punitive damages. While a $5,000 punitive damages award may seem modest in proportion to the seriousness of defendants’ misconduct, it is appropriate in light of the lack of a record regarding defendants’ financial position.
 

 Had there been any evidence suggesting that defendants were of average means, I would likely have made a substantial award of punitive damages. However, with no such evidence and the record suggesting that defendants could not afford counsel, $5,000 is the appropriate sum.
 
 See, e.g., Atencio v. City of Albuquerque,
 
 911 F.Supp. 1433, 1446 '(D.N.M.1995) (defendant’s financial capacity is “crucial factor” in determining appropriate punitive damages award);
 
 Wynn Oil Co. v. Purolator Chem. Corp.,
 
 403 F.Supp. 226, 232 (M.D.Fla.l974) (award of punitive damages should only hurt, not bankrupt, a defendant; the amount awarded should substantially punish the defendant, but not place it beyond a reasonable potential financial capacity to pay the award). Finally, I note that ORS 18.540 applies to this action, resulting in the payment of sixty-percent of this award to the State of Oregon, Criminal Injuries Compensation Account.
 
 See
 
 ORS 18.540(l)(b).
 

 IV. Counterclaims
 

 Defendants seek attorney’s fees in two counterclaims. First, they seek attorney’s fees under ORS 30.190(3) which provides for attorney’s fees and costs to a prevailing defendant in certain circumstances. Because defendants did not prevail on plaintiffs intimidation claim, they are not entitled to attorney’s fees. Next, defendants seek an award of fees under ORS 20.105 which allows a prevailing defendant to recover attorney’s fees when the party bringing the action willfully disobeyed a court order or had no objectively reasonable basis for asserting a claim. Plaintiff prevailed on three of the claims that went to trial. As to the fourth, she had an objectively reasonable basis for bringing the defamation claim. Defendants are not entitled to fees.
 

 CONCLUSION
 

 I find in favor of plaintiff on her intentional infliction of emotional distress claim, her intimidation claim, and her invasion of privacy claim. 1 find in favor of defendants on plaintiffs libel claim. T find in favor of plaintiff on defendants’ counterclaims for attorney’s fees.
 

 I award plaintiff $200,000 in noneconomic damages, $52,500 in economic damages, and $5,000 in punitive damages.
 

 IT IS SO ORDERED.
 

 APPENDIX A
 

 Exhibit 1
 

 TO THE CHURCH & EVERY MORAL CITIZEN:
 

 It has come to our attention through the testimony of over 9 witnesses that the
 
 *1132
 
 lodge in Christmas Valley has sold to two Lesbians.
 

 Are you going to allow an immoral abomination take a foot hold in the center of your community?
 

 Are you going to allow this infestation to exist amoung you?
 

 Do you not realize that when you compromise your Christian moral integrity that you throw away your witness for Christ at the same time?
 

 Can you see Christmas Valley as a mecca for Queers, Lesbians, Perverts
 
 &
 
 other degenerates by allowing it to start with these two Lesbians at the Lodge.
 

 Don’t you know that the principles of right conduct forbid the practice of disgusting, repulsive, immoral activities such as Lesbianism
 
 &
 
 homosexuality?
 

 Can you see that they will have friends who will come to party & live here & the purity of your area will become a Sodom & Gamorrah?
 

 The Bible teaches that what they are is an abomination
 
 &
 
 against Gods will & they are the Divils Desciples, no doubt.
 

 The good fight should start now. Anyone or anything that is against our Fathers house, we should all be against. They are the enemy.
 

 Make no comprimise with immorality. If you do, you will be an accomplice to their corrupt-immoral life style.
 

 Do something now before it goes any further.
 

 WHAT ARE YOU GOING TO DO ABOUT IT........
 

 Exhibit 2
 

 TO THE PARK & RECREATION BOARD:
 

 Did you not know that the sale of the Christmas Valley lodge was being made to two Lesbians?
 

 Did you not know that this sale is the beginning of corruption of our community?
 

 Did you not know that this brings an immoral & unfavorable element into our community?
 

 Are your only thoughts
 
 &
 
 considerations centered around money & business? What about the quality of the area & our lives. You have started a revolting development by allowing the sale of the Lodge to perverts.
 

 Do you not realize they have friends that will come here, buy in & cause all of our property values to fall?
 

 When Christmas Valley becomes a town known for its Lesbian & Homosexual population, you will only have yourselves to blame.
 

 We want purity of life here, not polution & corruption.
 

 Signed: Concerened Citizens of Christmas Valley
 

 
 *1133
 
 Cite as 90 F.Supp.2d 1108 (D.Or. 2000)
 

 Exhibit 3
 

 [[Image here]]
 

 Exhibit 4
 

 TO: EVERY MORAL CITIZEN IN CHRISTMAS VALLEY
 

 The word has come to us from our sources that the Lesbians who purchased the lodge there in Christmas Valley are planning two grand opening parties in celebration of their foot hold in your community. We’ve seen this all before.
 

 
 *1134
 
 It is said, by our sources (reliable), that one party will be for the local people (straights) and the other grand opening party is just for
 
 their
 
 friends. What kind of friends will they be inviting to your valley and why two seperate parties?
 

 Does this mean that there will be different fair at the second party? Does this mean that the first party is just a regular drunken brawl and the second party is a laytex party just for their degenerate friends? They are planning on introducing your clean valley to all their perverted friends in grand opening style. They are going to flaunt their degeneracy right in your faces. Say it isn’t so..............
 

 As local residents are you going to stand for this and just sit back and let it happen right there in your front yard? Say it isn’t so........
 

 Christmas Valley is not for queers, lesbians, degenerates and perverts but instead it is for a moral community of God fearing people.
 

 Boycott the evil which invades your community that came out of the Gay Bars of Portland. Give them no place amoung you.......
 

 Signed: Citizens for a Moral Society
 

 Exhibit 5
 

 Lake County Examiner
 

 P.O. Box 271
 

 Lakeview, Or 97630
 

 Letter to the Editor and Mr. Lance Mas-terson
 

 Dear Sirs:
 

 Your article of Thursday, May 23, 1996, page 6, entitled,
 

 ‘Letters backfire thanks to community support’ is a double backfire, thanks to you!
 

 When we sat down and shared your comments we found that you actually magnified the message of ‘The Citizens For A Moral Society’. Thanks again! Our letters have struck a nerve.
 

 Even though your article was pro-gay, your article proved to your readers that the couple who purchased the Christmas Valley Lodge were infact GAY LESBIAN IMMORAL, DEGENERATE PERVERTS.
 

 This information is all we were trying to get out to the community with our letters in the first place. You did that for us in a much bigger way. Our original intentions were to open up that fact to the community and let them decide for themselves what their response would be from that point.
 

 The American way, right?
 

 Your papers distribution did much more in getting
 
 our
 
 message out and for our cause than we could ever do for ourselves. Our letters of ‘community interest’ and comment were intended to bring forth this very same information to generate social action rather than apathy but your article far out shined our efforts to do just that.
 

 Your article, in our view, much more grealty favored morality than it did immorality that we send you a Veil done’, ‘good job’. Thanks Again:
 

 Signed: Citizens For A Moral Society
 

 Exhibit 6
 

 TO: EVERY MORAL CITIZEN IN CHRISTMAS VALLEY
 

 A very serious matter has been reported to us concerning the Christmas Valley Lodge. Our sources brought the following information to us last week that the work done on the Lodge was done without a building permit which is a violation of county code.
 

 But even worse, the partitions and other supporting structure and supporting members were removed which is another code violation to do such work without proper structural engineering.
 

 We have made a trip to Christmas Valley over the Memorial Day week end to verify
 
 *1135
 
 that these reports were true and found even worse proplems..
 

 At this very time the roof structure and the supports that were removed has caused the roof to sag noticably and the entire area of the remodeling is in danger of collapse and is a serious public hazard.
 

 The Christmas Valley Lodge should be closed, engineering developed and approved, building permit issued there on before the lodge could be open for business.
 

 The Christmas Valley Lodge has been purchased by two Lesbians on a down payment with the major amounts of funds still owed to the Park and Rec. which is actually your tax money.
 

 Who is going to pay for the engineering, the additional work necessary to comply with the codes and for that matter at this point the entire Lodge should be inspected and brought up to code before opening up for business.
 

 These perverts are destroying your property, using your tax money and not obeying the laws and the codes we are all expected to comply with. They are not only perverts, they are outlaws.
 

 The community should rise up in protest of strangers moving into the area and not obeying the laws we all have to obey and also doing damage to the Lodge which mostly belongs to you the people of Christmas Valley not those two lesbian, degenerate perverts.
 

 This is your town, not theirs. What goes on in your town should meet with your approval and the approval of all apprioate agencies as well.
 

 Signed: Citizens For A Moral Society
 

 Exhibit 8
 

 THE LESBIAN SPIRIT IS ON THE PROWL IN CHRISTMAS VALLEY
 

 Be forwarned, my people, the Lesbian spirit is a malignant, putrefied, demonic force that will infect you and yours together with all your community if left to stand amoung you. It will prowl amoung you to see who it can infect, devour, pervert or kill.
 

 It will dress and look like a clean fresh lovely girl ready for her marriage but this is only the facade where in fact her blood lust destroyes the kings of the earth. Inwardly she is a whore sitting on a scarlet colored beast full of blasphemy.
 

 She is decked with gold and precious stones and pearls having a golden cup in her hand but it is full of abominations and filthiness. The great mother of abominations and corruptions..
 

 Do not be deceived by her appearence. She will serve it up to you in a thousand ways and you will be caught like a fish on a hook. She is death personified, infecting every thing and everyone she comes incon-tact with.
 

 She is drunk with the blood of those good people she touched and now she resides in the center of your community at the Christmas Valley Lodge. Will that malignant, putrefied, degenerate, demonic spirit be allowed to devour the life of your comu-nity and infect you all with her perversions?
 

 It can happen if you do nothing. The worst thing a good man or woman can do is nothing. The time has come to stand up for righteousness and morality.
 

 Be forwarned good people of Christmas Valley, we have seen this all before .....first a toe hold, then a foot hold then a strong hold.
 

 Who else but you can say what takes place in your community except you. You are the town. You are the community and this country was founded by those who gave us a heritage of moral conduct and living. It is up to every generation to uphold that quality of life.
 

 How far will you let it go before you say, ‘enough is enough?’
 

 
 *1136
 
 When you actively or passivily allow perversion to exist amoung you, you also deny your moral roots and allow that malignant, putrefied, demonic spirit of Lesbianism corrpution to taint you.
 

 Signed: Citizens For A Moral Society
 

 Exhibit 9
 

 Linda Renk
 

 Our sources showed us your article in the Whispers which demonstrated your short sightedness not only by what you said in the article but also by your opinion which is grossly deficient and poorly informed. Of course you have lots of experience, right?
 

 By your article in the Whispers you embarrassed yourself to the entire community when you say you did your best and that the Lodge looks better. Thats as far as your thinking goes... .looks only. If that is the depth of your thinking, what you should do is resign, you don’t belong where compentant decissions are being made. Your statements and assessments only prove your lack of capasity and proper discernment to represent the people of your area.
 

 Be it made known to you Linda Renk that we are not hiding as you indicate but are challanging attitudes of people like you and it is working very well. Our goals are reached when we see little articles like yours which shows no decision making ability or personal integrity whatsoever.
 

 Linda Renk, you have nailed yourself by your own words.
 

 Be confronted Linda for your own sake. A greater and deeper platform of knowledge is a must before making decisions for a community.
 

 We are not in a possition to belong to every group; to attend every meeting; be at every gathering but we are confronting you and others by way of letters which do represent a good cross section of the population there.
 

 How about getting your head on straight, linda?
 

 Signed: Concerned Citizens of Christmas Valley
 

 Exhibit 10
 

 TO: Every moral citizen of Christmas Valley
 

 I believe no one can read the history of our country without realizing that the Good Book and the spirit of the Savior have from the beginning been our guiding geniuses ....
 

 Whether we look to the first Charter of Virginis or to the Charter of New England or to the Charter of Massachusetts Bay or to the Fundamental Orders of Connecticut, the same objective-is present... .A Christian land goverened by Christaan principles which does not include gay lesbian immoral degenerate perverts.
 

 I believe the entire Bill of Rights came into being because of the knowledge our forefathers had of the Bible and their belief in it. Freedom of belief, of expression, of assembly, of petition, the dignity of the individual, the sancity of the home, equal justice under law, and the reservation of powers to the people. I like to believe we are living today in the spirit of the Christian religion. I like also to believe that as long as we do so, no great harm can come to our'country. Supreme Court chief justice, Earl warren.
 

 But today we have perverts and their disgusting life styles that never intered into the minds of our forefathers or into the mind of justice Warren and such like do not fit under the regulations of this God given country.
 

 John Adams said, “Our Constitution was made only for a moral and religious people. It is wholly inadequate to the government of any other. 1798. And this principle is not out dated. It is like many other principles that apply just as valid today as before.
 

 
 *1137
 
 Is the death penalty at work in this country today? You better believe it is and it will be enacted by the people of this country who are sovereign on those who corrupt this country and who are the enemies of this country.
 

 The Bible savs, “I will kill your chrildren with death. (Rev.2:23) He shall rule you with a rod of iron. (Note the modern day equivilant of a rod of iron in todays world is a high powered rifle.)
 

 The wicked shall flee from the iron weapon and the Bow of Steel (rifle) shall strike him throw Job 20:24
 

 Signed: Citizens for a Moral Society
 

 Exhibit 11
 

 TO: Every Moral Citizen Of Christmas Valley
 

 ATTN: Elders, Pastors, Clergymen, Priests, Laymen and Friends of Christ
 

 Have any of you called on the Lesbians at the Christmas Valley Lodge and asked them to cease in their immoral life style?
 

 Have any of you asked them to recant their immoral, perverted, degenerate living and offered your help and counselling for Christ sake?
 

 Have any of you invited them to your church if they would stop their immoral living?
 

 All of you who value moral living above any other life style should check your own spirit. If you have not tried to speak to Joanne and June of the error of their ways, Ladies and Gentlemen, you are shirking your Christian Pastoral duty by not doing so.
 

 Have any of you ministered to these two women? If you do not have a ministry consider this challange to be one worthy of your attention. Not once but persistently calling on them with encouragement to cease their immoral living and give their lives to Christ.
 

 Ladies of Christmas Valley, have any of you gotten together and prayed about these two fallen people and made a pilgrimage to the Lodge to have a word with the two Lesbian perverts in an effort to convert them to living a Bibical life rather than a lost way of life?
 

 Ladies and Gentlemen, if you have not done what is suggested here as yet, let us incourage, you and charge you in Jesus name to do it now.....
 

 Also, you church members, lay people and Christians at large and caring people, have you spoke to June and Joanne about a straight life rather than a twisted one?
 

 You are also charged with the same responsibility. This letter speaks of our goals for you and for them, a Moral Society. .
 

 Signed: Citizens For A Moral Society
 

 Exhibit 12
 

 JOHN WIDENOJA
 

 It appears your degenerate, pervert friends at the Christmas Valley Lodge are not making it. Maybe you didn’t buy enough stakes from your queer loving bank roll.
 

 They are going down, one way or another. This community will not stand for a life of immoral conduct and they won’t stand for you either.
 

 Since you personally and publically supported these immoral, degenerate perverts in your own community, you have made a target of yourself and you are going down too. One way or another, its just a matter of time. You are on the list of people that are targeted.
 

 That attention will be directed your way at the proper time in the near future. You will never know what hit you.
 

 We are hoping you will change your approach to life and attitude and support the moral integrity this country was founded on. If not, take the consequences.
 

 
 *1138
 
 Signed:
 

 Citizens For A Moral Society
 

 Exhibit 13
 

 JUNE LEFT
 

 NOW ITS YOUR TURN TO GO
 

 HEAD FIRST OR FEET FIRST
 

 [1]
 

 . Although plaintiff initially also named "Concerned Citizens of Christmas Valley” and John Does 1 through 25 as defendants, she failed to substitute named individuals for the John Does and at trial she offered no proof of any actions by the John Does or the Concerned Citizens of Christmas Valley. Therefore, these defendants are dismissed with prejudice.
 

 [2]
 

 . Jurisdiction in this case was originally based on the presence of a federal question, 28 U.S.C. § 1331, by virtue of plaintiff’s claim under the federal Violence Against Women Acl, 42 U.S.C. § 13981. Although I dismissed that claim in an earlier opinion, I exercised my discretion in favor of retaining jurisdiction over the remaining supplemental state tort claims in light of the impending trial date. 28 U.S.C. § 1367(c)(3).
 
 Simpson v. Burrows,
 
 No. CV-97-6310- HU, Opinion and Order at p. 9 (D.Or. Dec. 7., 1999).
 

 [3]
 

 . An
 
 Alford
 
 plea is a plea entered pursuant to
 
 North Carolina
 
 v.
 
 Alford,
 
 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), which permits a defendant to enter a plea of guilty to a charged offense, although he does not admit that he committed the charged offense, provided there is strong evidence of actual guilt and the defendant intelligently concludes that his interests require entry of a guilty plea.
 
 See United States v. Diamond,
 
 53 F.3d 249, 251 n. 1 (9th Cir. 1995).
 

 [4]
 

 . It’s worth noting that even if I were to credit Mr. Burrows’s outlandish theory, it still could support a finding that he authored and distributed the letters. A person with such an interest in the contents of these documents so as to pick them up and carry them home instead of disposing of them immediately on site, would likely have the capacity to write and/or circulate similar letters.
 

 [5]
 

 . Although not technically a diversity action given the initial pleading of the federal claim, because the remaining claims are all state law claims, the case is akin to a diversity action and it is proper to rely on state law for the burden and standard of proof.
 

 [6]
 

 . Although the Oregon Supreme Court recently invalidated ORS 18.560's cap on noneconomic damages,
 
 Lakin v. Senco Prods., Inc.,
 
 329 Or. 62, 987 P.2d 463 (1999), the statute’s definition section still provides some guidance as to the types of injuries encompassed by an award of noneconomic damages.
 

 [7]
 

 . Plaintiff did not suggest that the statements at issue were unprotected under other theories. Even if she had, however, I conclude that the statements were not likely to cause a breach of the peace by provoking the average person to retaliate, and thus, are not the classic "fighting words” which are outside the realm of First Amendment protection.
 
 Texas v. Johnson,
 
 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). I also conclude that the statements were not sufficiently directed to inciting or producing imminent lawless action and were not likely to produce such action.
 
 Collins v. Jordan,
 
 110 F.3d 1363, 1371 (9th Cir. 1996) (citing
 
 Brandenburg v. Ohio,
 
 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam)).
 

 [8]
 

 . Because it is not apparent from the record that the criminal court that accepted Mr. Burrows’s
 
 Alford
 
 plea conducted the required inquiry into the factual basis for the plea or its voluntariness, I need not determine what effect a criminal conviction for the conduct at issue would have on the true threat determination.